SAM PRESLEY, SR., and ESTATE OF LOUISE PRESLEY, Deceased, SAM PRESLEY, SR., Administrator, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; SAM PRESLEY, SR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Presley v. Comm'r
Docket Nos. 1867-70, 5051-70, 4720-71. United States Tax Court T.C. Memo 1979-339; 1979 Tax Ct. Memo LEXIS 189; 38 T.C.M. (CCH) 1301; T.C.M. (RIA) 79339; August 27, 1979, Filed *189 Held:
(1) H and W filed joint Federal income tax returns for 1963 and 1964. (2) Except for $200.00 in 1962 and $468.41 in 1965, H and W did not underreport their taxable income from an illegal casino. (3) H and W are entitled to offset their 1962 and 1963 wagering income from a casino by their 1962 and 1963 wagering losses from H's other gambling activities. (4) H and W failed to prove they incurred gambling losses in 1965. (5) H and W did not have unreported income from the operation of a bar and lounge. (6) H and W did not carry their burden of proving they were entitled to deduct certain automobile expenses. (7) H and W did not carry their burden of proving they were entitled to deduct certain telephone expenses. (8) H and W did not carry their burden of proving they were entitled to deduct certain travel expenses. (9) H and W are not entitled to bad debt deductions for 1964 and 1965 because they failed to prove the debts became worthless in such years. (10) H and W are entitled to claim a dependency exemption for H's sister. (11) W is not relieved of liability for the deficiencies for 1962 and 1965 under the provisions of sec. 6013(e), I.R.C. 1954, but she is not liable *190 for the deficiencies for 1963 and 1964 because the Commissioner did not send her either a joint or separate notice of deficiency. (12) No part of any of the underpayments of tax was due to fraud on the part of either H or W. Roland J. Mestayer, Jr., for the petitioners. Frank Simmons, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in and additions to the petitoners' Federal income taxes: Addition to Tax
Sec. 6653 (b)
Petitioner
Year
Deficiency
I.R.C. 1954 [1]
Sam Presley, Sr.,
1962
$144,936.09
$ 72,468.05
and Louise
1965
106,030.41
53,015.21
Presley
Sam Presley, Sr.
1963
194,092.17
97,046.09
1964
206,468.81
103,234.40
The parties have settled some of the issues. The issues remaining for decision are: (1) Whether the income tax returns signed and filed by Sam Presley, Sr., for 1963 and 1964 were joint Federal income tax returns of both Sam and Louise Presley; (2) whether Sam and Louise had unreported income from the operation of an illegal casino at the Sage Patch; (3) whether Sam *191 and Louise were entitled to a deduction for Sam Presley's other gambling losses in 1962 and 1963 to the extent such losses exceeded his other gambling income; (4) whether Sam incurred other gambling losses in 1965 of at least $4,500; (5) whether Sam and Louise had unreported income frm the operation of a bar and lounge at the Sage Patch; (6) whether Sam and Louise were entitled to deduct certain automobile expenses as business expenses for each of the years in issue; (7) whether Sam and Louise were entitled to deduct certain telephone expenses as ordinary and necessary business expenses for 1962, 1963, and 1964; (8) whether Sam and Louise were entitled to deduct certain travel expenses as ordinary and necessary business expenses while away from home for each of the years in issue; (9) whether Sam and Louise were entitled to a deduction for bad debts for 1964 and 1965; (10) whether Sam and Louise were entitled to claim a dependency exemption for Doris Presley, Sam's sister; (11) whether the estate of Louise Presley is relieved of liability for any of the deficiencies either because Louise qualified as an innocent spouse under the provisions of section 6013(e) or because for 1963 and *192 1964 the only deficiency notice in this case was a separate notice issued to Sam; and (12) whether the petitioners are liable for the additons to tax under section 6653(b) because a portion of the underpayment of taxes for each of the years in issue was due to Sam's fraud with intent to evade tax. FINDINGS OF FACT General Findings
Some of the facts have been stipulated, and those facts are so found. The original petitioners, Sam Presley, Sr., and Louise Presley, were husband and wife, and resided in Biloxi, Miss., at the time they filed their petitins in this case. They filed their Federal income tax returns for the years in issue with the District Director of Internal Revenue, Jackson, Miss. Since the filing of their petitoins, Mrs. Presley has died, and her estate has been substituted as a party. Mr. Presley will sometimes be referred to as the petitoner or Sam, and Mrs. Presley, as Louise. The petitioner was born in 1899. His formal education consisted of completing the first six grades of elementary school and part of the seventh grade. He became a professional gambler in 1933, and he continued in such occupation throughout the years in issue. Issue 1. Joint Return
FINDINGS *193 OF FACT For 1962, 1965, and for many years prior to 1962, Sam and Louise filed joint Federal income tax returns. For 1967 through 1969, they filed joint Federal and State income tax returns. For 1963 and 1964, the Federal income tax returns filed by Sam listed the taxpayers as "Sam & Louise Presley." On such returns, the filing status box "Married filing joint return (even if only one had income)" was checked, and exemptions for both Sam and Louise were claimed. Both returns had been signed by Sam, and he also signed Louise's name to such returns after securing her oral permission to do so. At the time he signed her name to the 1963 tax return, Louise wasill. On the 1964 Federal income tax return, Sam indicated he had signed Louise's name by adding under her name "By S.P." Sam did not receive a written and signed power of attorney from Louise, and no such instrument was submitted with the 1963 or 1964 tax returns. In his notice of deficiency, the Commissioner determined that Sam and Louise did not file joint Federal income tax returns for 1963 and 1964. OPINION The first issue for decision is whether Sam and Louise filed joint Federal income tax returns for 1963 and 1964. The *194 Commissioner argues that Sam did not follow the requirements in the regulations relating to returns filed and prepared by agents and that, therefore, the returns were not joint. The petitoners argue that because Sam and Louise intended to file joint returns, and because Sam and Louise treated the 1963 and 1964 returns as joint returns, they are joint returns. Under section 6012(a), Sam and Louise were required to file Federal income tax returns. Under the provisions of section 6013(a), they could elect to file a joint return. Section 1.6013-1(a)(2), Income Tax Regs., provides: (2) A joint return of a husband and wife (if not made by an agent of one or both spouses) shall be signed by both spouses. The provisions of paragraph (a)(5) of § 1.6012-1, relating to returns made by agents, shall apply where one spouse signs a return as agent for the other * * * For the years here at issue, section 1.6012-1(a)(5) provided in part: (5) Returns made by agents. The return of income may be made by an agent if the person liable for the making of the return is unable to make it by reason of illness * * * Whenever a return is made by an agent it shall be accompanied by the prescribed power of attorney, *195 Form 935, except that an agent holding a valid and subsisting general power of attorney authorizing him to represent his principal in making, executing, and filing the incom return, may submit a certified copy thereof in lieu of the authorization on Form 935. * * * However, in 1973, such regulations were amended to provide in relevant part as follows: (5) Returns made by agents. The return of income may be made by an agent if, by reason of disease or injury, the person liable for the making of the return is unable to make it. * * * Whenever a return is made by an agent it must be accompanied by a power of attorney (or copy thereof) authorizing him to represent his principal in making, executing, or filing the return. A form 2448, when properly completed, is sufficient. In addition, where one spouse is physically unable by reason of disease or injury to sign a joint return, the other spouse may, with the oral consent of the one who is incapacitated, sign the incapacitated spouse's name in the proper place on the return followed by the words "By     Husband (or Wife)", and by the signature of the signing spouse in his own right, provided that a dated statement signed by the spouse *196 who is signing the return is attached to and made a part of the return stating-- (i) The name of the return being filed, (ii) The taxable year, (iii) The reason for the inability of the spouse who is incapacitated to sign the return, and (iv) That the spouse who is incapacitated consented to the signing of the return. Here, Sam testified that Louise was ill when he signed her name to the 1963 return, and that he secured her oral permission to sign both the 1963 and 1964 returns. However, he did not have, nor did he submit with such returns, a written power of attorney authorizing him to sign them. In addition, he did not submit with the tax returns the dated and signed statement required by the present regulations, explaining why he signed her name. Therefore, whether we look to the old or new regulations, Sam did not meet their requirements. Yet, it has long been settled that the absence of the signature of one spouse does not prevent a return from being a joint return, where it is clear that the spouses intended to file a joint return. Estate of Temple v. Commissioner,67 T.C. 143, 164 (1976); Estate of Campbell v. Commissioner,56 T.C. 1, 12 (1971); Hennen v. Commissioner,35 T.C. 747, 748 (1961). *197 Whether Sam and Louise intended to file joint income tax returns for 1963 and 1964 is a question of fact to be resolved on the basis of all the facts and circumstances. Estate of Campbell v. Commissioner,supra.The petitioners bear the burden of proof on this issue, and based on all of the evidence, we conclude that they have met their burden. The evidence establishes that both returns were filled out as joint returns, and that prior and subsequent to 1963 and 1964, Sam and Louise filed joint income tax returns. Sam acknowledges that he signed the returns, but it is undisputed that he secured Louise's oral permission to do so. Accordingly, we hold that the 1963 and 1964 returns were the joint Federal income tax returns of Sam and Louise Presley. Issue 2. Unreported Casino Income
FINDINGS OF FACT During the years, in issue, Sam was the owner of a business, known as the Sage Patch, located on the Alabama-Mississippi State line. The front room of the Sage Patch was used as a bar and louge, and the back room, which was completely seprate from the front room, was used to operate an illegal gambling casino. The Sage Patch had toilet facilities, as well as a small room off the back *198 room used as a business office. During the years in issue, the casino was managed and operated by the petitioner, his two nephews, Charles Raymond Presley (Ray) and Pat Presley (Pat), and Morris Machefsky (Morris). The casino had several other employees, including dealers and, at times, a cashier. It was generally open 7 days a week from 7:00 p.m. until the players left, which was usually between 3:00 and 5:00 a.m. During the years in issue, a patron of the casino could play blackjack, dice, and roulette. Though the casino had only one roulette wheel during the years in issue, it had two dice tables, and two or three blackjack tables. However, most of the time, only two or three tables were in use. At all tables, the players were required to gamble with chips purchased at the Sage Patch. At the blackjack table, the chips were purchased from the dealer, who put the money through a slot which was on the top of the blackjack table and which led to a box attached to the underside of such table. At the dice tables, a player purchased chips by giving him money to the dealer, who passed it to the "box man," the person at such table who was in charge of a wooden money box. The box *199 man counted the money and placed it in a box which was either on top of the table or attached to the underside of the table just below a slot in the table. Then, the box man instructed the dice dealer to give the player an equivalent amount of chips. During the earlier years, a player at any of the tables cashed out, i.e., exchanged chips for an equivalent amount of cash, by bringing his chips to a dealer at a dice table. The dealer counted the chips and passed them to the box man, who also counted them and then gave the player an equivalent amount of cash. The box man made a notation on a pad of paper recording the amount of the cashout. In later years, a cashier was employed to cashout players. At the beginning of the evening, the cashier was given a fixed sum of money. A player wishing to cashout brought his chips to the cashier, who counted them and gave the player an equivalent amount of cash. On occasion, the cashier also cashed a check of a player when instructed to do so by Same, Ray, Pat, or Morris. The cashier also kept irregular records on a ledger sheet of some of the cashout transactions. At the end of the evening, the cashier had to have cash, checks, and chips *200 equivalent to the amount of cash that she started with at the beginning of the evening. Generally, the cashier was closed out either by Pat or Ray. At the conclusion of each evening's business, the boxes under the blackjack tables, and the boxes on or under the dice tables were taken to the office of the casino and the contents thereof were counted. As a means of checking up on his employees and allowing them to protect themselves, Sam insisted that a minimum of two people be present when the nightly proceeds were counted. Frequently, three or even four people were present when the money was counted. Those generally present when the proceeds were counted were Ray, Pat, Morris, and on occasion, Ivan A. Wixon (Ivan). Since Sam frequently left the casino prior to closing, he participated in the counting only occasionally. Sometime during the 1950s, Sam decided to adopt accounting procedures for the casino which would accurately reflect his income. Accordingly, Sam adopted the practice of having either Ray or Pat summarize on paper the casino's daily gambling activites. The daily summary was called a "daily report" and the typical report had the following entries: Name Date Cash on *201 hand to open $ CASH RECEIPTS: Chips Sold $ Total Cash Receipts $ Total Cash on hand & Cash Receipts $ CASH DISBURSEMENTS: Chips Cashed $ Actual Cash Payroll Utilities Total Cash Disbursements $ Cash on hand at close $ Remarks: Manager Generally, nothing was written in the "Name" entry, but the daily report was always dated. In the line "Cash on hand to open," there was entered the amount of the casino's bankroll, i.e., the accumulated and undistributed profits at the beginning of the day's play. The bankroll was considered the working capital of the casino: a portion of it was kept in a safety deposit box, a portion was kept by the cashier to cashout players, a portion was kept in one of the boxes, and the remainder was kept on the person of one of the employees at the casino, usually Morris, in case extra cash was need to cashout players. Under "Cash Receipts," the first entry was made on the line "Chipa Sold." Such amount reflected the dollar amount of chips sold for cash during the evening, and it was computed by adding the amount of cash in the boxes at the end of the evening to the dollar amount of chips cashed out during the course of the evening and by subtracting any amounts *202 placed in the boxes from the bankroll. The amount of chips cashed out was computed from the notations that were made by the boxman at the time of the cashouts, and the notations were destroyed sometime thereafter. The chips sold entry did not include chips that were purchased with checks by players. On the blank line directly below "Chips Sold," the word "Collected" or "Collections" and a dollar amount were handwritten on some of the daily reports. Such entry represented the casino's accounting procedure for checks. A player at the casino could purchase chips with a personal or business check if approved by either Pat, Ray, Sam, or Morris. At the end of the evening when the nightly proceeds were being counted, the checks received that day were not included in the daily report, but each check was listed on a ledger sheet containing the maker and the amount of the check. Every few days, the checks were taken to the Merchants & Marine Bank in Pascagoula, Miss. (the bank), by either Pat, Ray, or Sam and presented for collection. The person who endorsed the checks generally took them to the bank. Under an arrangement Sam had with the bank, all of the checks were taken to the head *203 teller, who cashed them. In addition, checks which had been cashed at the bank on prior occasions and which had been dishonored for one reason or another were repurchased from the bank for cash. Upon returning to the casino, such person had to produce cash and dishonored checks equal to the dollar amount of checks which he had presented and cashed at the bank that day. The net amount of the checks cashed, i.e., checks presented and cashed minus dishonored checks repurchased, was treated as a cash item and entered on the daily report as collections on the day of the banking transaction. A check which had been cashed and not dishonored was marked off the ledger sheet. The sum of "Chips Sold" and "Collected" equalled the next entry, "Total Cash Receipts." Cash on hand to open was then added to total cash receipts to arrive at the next entry "Total Cash on hand & Cash Receipts." The next portion of the daily report recorded "Cash Disbursements." In the line "Chips Cashed," there was entered the amount paid out by the casino to cashout players. In the line "Actual Cash Payroll," there was entered the weekly wages paid to employees of the casino, including Morris, Pat, and Ray. In the *204 line "Utilities," there was entered the operating expenses of the casino, such as electric, gas, telephone, bookkeeping, social security taxes, withholding taxes, dice, charity, and maintenance. The sum of all of the cash disbursements equalled the next entry, "Total Cash Disbursements. " By subtracting total cash disbursements from total cash on hand and cash receipts, "Cash on hand at close" was computed. Such amount also represented the next day's cash on hand to open. Sam, as owner of the Sage Patch, occasionally declared a "dividend" when the casino's bankroll became sufficiently large. Under his employment arrangements with Ray, Pat, and Morris, he agreed to pay them a weekly wage and to give them a percentage of the profits while they worked at the casino. Pat, ray, and Morris were simply employees of Sam; they did not have any writen agreement with Sam, and they were not required to make any capital contribution to be entitled to a percentage of the profits. Sam determined how much to pay his employees and how the profits were to be divided. Sam generally received between 70 and 75 percent of the profits, and the rest was split among Pat, Ray, and Morris.On the days that *205 dividends were declared, the amount of the dividend was subtracted from the "Cash on hand at close" to reflect the decrease in the operating capital of the casino.
Sam seldom counted money at the end of the evening, he never filled out a daily report, and he only occasionally took the checks to the bank. The daily reports were relied on by Sam, Pat, Ray, and Morris in dividing the profits. A check from the Whiteney National Bank of New Orleans, La., dated July 1, 1965, in the amount of $468.41 to Reco Construction Co. was endorsed by Louise. She received the check from Sam, and on July 13, 1965, she deposited it in her account at the Gulf National Bank, Gulfport, Miss. On March 9, 1962, Louise deposited in her account at the Hancock Bank, Gulfport, Miss., a check dated March 6, 1962, in the amount of $200. Louise also received this check from Sam. During the mid-1960s, John E. Montgomery, a special agent in the Intelligence Division of the IRS, audited and investigated the Presley's Federal income tax returns for the years in issue.In conducting this investigation, he was assisted by revenue agent Robert E. Waterbury and special agent James R. Kelly. At the outset of the investigation, *206 Sam was asked to produce all of his books and records. At the beginning of the audit, Sam provided them with the daily reports for 1962, 1963, and 1964, but he did not produce the daily reports for 1965 during the audit. These were the only records Sam turned over to the agents. None of the underlying records were made available to the agents. As part of theinvestigation, all three agents, with authorization from Sam, examined certain records at the bank. Their purpose was to search the bank records on specific dates for checks endorsed by Sam, Pat, Ray, Morris, or Louise. Upon finding on the bank's microfilm records a check endorsed by any of such persons, the agents made a printout of the front and back of the check. The agents printed on such copies the day on which, according to the bank's records, the check had been presented for collection at the bank. Thereafter, the agents contacted many of the markers of the checks and asked why they had drafted the check and if they had any additional checks which had endorsed by Sam, Pat, Ray, Morris, or Louise. Then, for each of the years in issue, Messrs. Montgomery and Waterbury examined the tellers' cash books for certain designated *207 dates, usually Mondays, searching for dishonored checks which had been picked up by someone from the casino. Upon finding such a check, they copied down the date it had been picked up, by whom, and the amount of the chieck. The revenue agents collated and summarized in their work papers the checks cashed, the dishonored checks retrieved, and the amount reported as collections on specific dates as follows: Total
Total Bad
Collection
Checks
Chiecks
Amount In
Date
Cashed
Retrieved
Daily Reports
1962
1/2 $ 616.13 $ 750.00
1/22
1,516.37
1,619.00
1/29
450.00
2/5
1,498.00
2,819.00
2/19
635.48
2/23
277.57 $ 225.00
3/26
745.35
525.00
4/23
564.28
1,030.00
5/28
868.65
665.00
5/29
187.00
187.00
7/5
198. 01
338.00
7/30
785.00
635.00
8/13
576.00
651.00
8/15
200.00
9/6
300.00
50.00
9/17
1,933.51
755.00
10/8 2,150.30
350.00
1,733.00
10/29
1,843.07
1,788.00
11/2
450.00
100.00
362.00
11/7
547.67
975.00
11/12
1,44 1.20
1,694.00
11/19
1,817.07
225.00
862.00
11/26
2,233.51
300.00
1,827.00
12/3
1,452.19
400.00
1,072.00
12/18
918.30
970.00
77.00
$24,204.69
$4,175.00
$18,829.00
1963
1/7
$ 3,478.45 $ 10.00
$ 1,986.00
1/14
1,140.21
1,571.00
1/21
672.40
1,742.00
1/28
1,568.75
3,693.00
2/4
1,951.51
280.00
1,672.00
2/11
2,575. 20
335.00
2,574.00
2/18
3,311.57
75.00
1,736.00
3/4
1,788.14
620.00
663.00
3/11
2,305.75
825.00
2,216.00
3/18 485.93
358.00
3/25
1,486.42
1,061.00
4/1
1,720.68
727.00
4/8
706.02
200.00
4/15
988.73
150.00
903.00
4 /22
866.35
1,026.00
4/29
2,892.82
440.00
2,601.00
5/6
1,573.26
300.00
1,881.00
5/13
8,245.28
550.00
3,912.0 0
6/3
1,593.81
500.00
1,504.00
6/20
1,390.87
100.00
1,206.00
7/8
2,673.46
2,763.00
7/9
300.00
152.20
46.00 7/22
629.76
400.00
670.00
7/29
6,002.94
5,810.00
9/3
9,837.39
8,404.00
9/5
1,500.00
9/9
2,841.32
9/23
331. 40
356.00
10/11
654.29
1,010.00
11/14
500.00
50.00
11/26
697.19
150.00
647.00
12/2
1,943.93
1,673.00
12/9 1,596.48
310.00
1,125.00
12/13
2,162.02
2,292.00
12/16
1,695.83
3,045.00
12/23
1,615.18
300.00
1,397.00
12/27
1,110.00
1,110.00
12/30
4,932.53
5,052.00
12/31
550.00
105.00
545.00
$82,315.87
$6,862.20
$67,967.00
1964
1/13
$ 3,448.73
$ 3,200.00
$ 3,398.00
1/17
405.61
550.00
35.00
1/31
1,390.00
330.00
1,140.00
2/24
2,629 .55
930.00
3,765.00
3/3
24.00
3/9
280.00
12,139.00
3/12
15,100.00
15,100.00
3/26
500.00
8.00
3/27
1,000.00 3/30
1,733.13
1,954.00
4/4
200.00
4/15
490.00
1,812.00
4/22
1,500.00
115.00
560.00
4/27
2,792.46
2,544. 00
5/8
725.14
800.00
5/22
420.00
400.00
5/25
1,257.16
1,505.00
6/4
50.00
6/5
780.20
4,067.00
6/11
383.00 570.00
6/12
145.00
21.04
380.00
6/23
650.00
7/8
737.50
900.00
7/10
782.00
250.00
1,063.00
10/9
994.90
3,120.0 0
10/24
200.00
11/2
3,160.22
177.00
11/3
1,571.00
3,707.00
11/30
935.00
12/7
1,362.50
772.53
1,190.00
12/4
3 ,036.89
153.00
5,116.00
12/18
165.60
65.00
12/21
636.53
80.00
1,754.00
12/22
703.91
888.00
12/28
2,247.88
2,513.00
$52,437.91
$12,376.57
$64,695.00
*208 In his answer, the Commissioner determined, based on the agents' workpapers, that the petitioner had unreported income from checks as follows: Collected Amounts
Less Total
Shown In
Total Checks
Bad Checks
Unreported
Date
Daily Reports
Cashed
Retrieved
Income
1962
1/29 $ 450.00 $ 450.00
2/19
635.48
635.48
2/23
277.57 $ 225.00
52.57
3/6
Checks deposited to Mrs. Sam Presley, Sr., acct.
200.00
3/26
745.35
525.00
220.35
5/28
665.00
868.65
203.65
7/30
635.00
785.00
1 50.00
8/15
200.00
200.00
9/6
300.00
50.00
250.00
9/17
775.00
1,933.51
1,158.51
10/8
1,733.00
2,150.30 350.00
67.30
10/29
1,788.00
1,843.07
55.07
11/19
862.00
1,817.07
225.00
730.07
11/26
1,827.00
2,233.54
300.00
106.54
$ 8,285.00
$14,239.54
$1,675.00
$4,479.00
1963
2/18
$ 1,736.00
$ 3,311.57 $ 75.00
$ 1,500.57
3/4
663.00
1,788.14
620.00
505.14
3/18
358.00
485.93
127.93
3/25
1,061.00
1,486.42
425.42
4/1
727.00
1,720.68
99o.68
4/8
706.02
200.00
506.02
5/13
3,912.00
8,245.28
555.00
3,778.28
6/20
1,206.00
1,390.87
100.00
84.8 7
7/9
46.00
300.00
152.20
101.80
7/29
5,810.00
6,002.94
192.94
9/3
8,404.00
9,837.39
1,433.39
9/5
1,500 .00
1,500.00
9/9
2,841.32
2,841.32
11/14
500.00
50.00
450.00
12/2
1,673.00
1,943.93
270.93
12/9
1,125.00
1,596.48
310.00
161.48
$26,721.00
$43,656.97
$2,062.20
$14,873.77
1964
3/3 $ 24.00 $ 24.00
3/26
500.00 $ 8.00
492.00
3/27
1,000.00
1,000.00
4/4
200.00
200.00
4/22 $ 560.00
1,500.000
115.00
825.00
4/27
2,544.00
2,792.46
248.46
6/4
50.00
50.00
6/23
650.00
650.00
10/24
200.00
200.00
11/2
3,160.00
177.00
2,983.22
11/30
935.00
935.00
12/18
65.00
165.00
100.00
$ 3,169.00
$11,117.18 a *209 $ 300.00
$7,708.00
1965
7/1
Check
deposited to Mrs. Sam Presley, Sr., acct. $ 468.41
The agents also audited the daily reports for 1962, 1963, and 1964. Based on their entire investigation, they concluded that the operating expenses of the casino, as reflected in the daily reports, were reasonable and that Sam actually incurred such expenses. They also determined that Sam had receipts in the amounts indicated on the "Chips Sold" entries. For 1965, they projected receipts and expenses based on the 1962 through 1964 daily reports since the 1965 daily reports were not then available to them. In his original report, Mr. Waterbury proposed to allow all of the cash disbursements reflected on the daily report each day to the extent such disbursements were not in excess of the daily cash receipts. However, on the days cash disbursements exceeded cash receipts, he proposed to disallow the daily excess losses. In the notices of deficiency for 1962, 1963, and 1965, the Commissioner adopted the conclusion of the agents, except that for each of such years, only $100,000 of the claimed chips cashed was disallowed. The casino income, including income from the operation of the bar and lounge, was recomputed as follows: *210 Item
1962
1963
1965
Gross receipts: Sage Patch casino
$743,912.00
$738,921.00
$1,178,535.75
Bar profits
8,851.21
9,045.65
14,572.89
Unreported gambling
receipts
4,479.54
14,873.77
468.41
Total Sage Patch
income
$757,242.75
$762,840.42
$1,193,577.05
Expenses: Chips cashed
488,357.00
474,240.00
819,629.83
Other expenses a
97,120.00
107,835.10
145,805.93
Total expenses
$585,477.00
$582,075.10 $ 965,435.76
Net profit
$171,765.75
$180,765.32 $ 228,141.29
Sage Patch income
per return ad-
justed for depre-
ciation and ac-
counting expenses
55,058.25
69,340.90
52,543.11
Understatement
of income
$116,707.50
$111,424.42 $ 175,598.18
For 1964, the Commissioner recomputed the petitioner's income from the Sage Patch casino by disallowing on a daily basis all cash disbursements in excess of cash receipts. The following is a summary of the Commissioner's reconstruction of the petitioner's income from the casino and the bar: Gross receipts
$933,198.00
Less: Payouts and chips cashed
728,178.00
Net
$205,020.00
Plus: Net daily loss disallowed
222,167.00
Net wager income
$427,187.00
Add: Bar profits
12,027.07
Unreported gambling receipts
7,708.18
Total Sage Patch income
$446,922.25
Other expenses a *211 125,392.10
Net profit
$321,530.15
Sage Patch income per return
(adjusted for depreciation
and accounting expense)
74,144.90
Unreported Sage Patch income
$247,385.25
In amended answers, the Commissioner adjusted the petitioner's income for 1962, 1963, and 1965 by disallowing daily cash disbursements to the extent they exceeded daily cash receipts. In addition, since the Commissioner had access to the daily reports for 1965 prior to filing the amended answer, he adjusted the actual figures to reflect the amounts in the daily reports, and he abandoned the projected figures. The following is a summary of the adjustments which increased the deficiencies and additions to tax for 1962 and 1963 and decreased such amounts for 1965: Item
1962
1963
1965
Gross receipts
$743,912.00
$738,921.00
$1,031,521.00
Less: payout and chips
588,357.00
574,240.00
787,070.00
Net
$155,555.00
$164,681.00 $ 244,451.00
Plus: net daily loss
disallowed
153,135.00
177,042.00
119,840.00
Net wager income
$308,690.00
$341,723.00 $ 364,291.00
Add: bar profit
8,851.21
9,045.65
14,572.89
unreported gam-
bling income
4,479.54
14,873.77
468.41
Total Sage Patch
income
$322,020.75
$365,642.42 $ 379,332.30
Minus: other expenses
97,120.00
107,835.10
195,803.30
Net profit
$224,900.75
$257,807.32 $ 183,529.00
Sage Patch income
per return adjusted
for acconting and
depreciation
expenses
55,058.25
69,340.90
52,543.11
Understatement of
$169,842.50
$188,466.42 $ 130,985.89
income
OPINION *212 The issue for decision is whether Sam and Louise had unreported income from the operation of the casino. In the deficiency notices, the Commissioner in effect took the position that Sam's method of accounting for the profits and losses of the casino, as reflected in the daily reports, did not accurately reflect the casino's income. The Commissioner maintains that the daily reports of the casino are not adequate records within the meaning of section 1.6001-1(a), Income Tax Regs., which imposes on all taxpayers the duty of maintaining "permanent books of account or records * * * as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information." Schooler v. Commissioner,68 T.C. 867, 870-871 (1977). Accordingly, the Commissioner reconstructed the casino income under section 446(b), which provides that "If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." In his deficiency notices, *213 the Commissioner took a two-pronged approach to reconstructing the petitioner's income from the casino: one prong dealt with the deductions claimed for "Chips Cashed," and the other prong dealt with amounts reported as "Collected." As to the deductions for chips cashed, the Commissioner, in his deficiency notices, reconstructed the casino income for 1962, 1963, and 1965 by simply disallowing $100,000 of deductions claimed for chips cashed. In the notice of deficiency for 1964, and in amended answers for 1962, 1963, and 1965, the Commissioner reconstructed the casino's income by disallowing, on a daily basis, losses to the extent they exceeded winnings. On the days that daily winnings exceeded daily losses, the Commissioner allowed such losses. The amendments to the answers increased the deficiencies for 1962 and 1963 and decreased the deficiency for 1965. Under certain circumstances, the disallowance of daily net gambling losses is not an arbitrary, erroneous, or unreasonable method of reconstructing income. Stein v. Commissioner,322 F. 2d 78 (5th Cir. 1963), affg. a Memorandum Opinion of this Court; Plisco v. United States,306 F. 2d 784 (D.C. Cir. 1962), cert. denied 371 U.S. 948 (1963); *214 Green v. Commissioner,66 T.C. 538, 544 (1976). Such method is based on the theory that the claimed winnings are an admission against interest and the claimed losses are self-serving declarations which must be proved by verifiable data. Green v. Commissioner,supra.The amount of losses sustained presents an issue of fact to be decided on the basis of all the facts and circumstances. Schooler v. Commissioner,supra at 869; Green v. Commissioner,supra at 545. As a general rule, the deficiency determinations of the Commissioner are presumptively correct ( Welch v. Helvering,290 U.S. 111, 115 (1933)), and the petitioner bears the burden of proving otherwise (Rule 142, Tax Court Rules of Practice and Procedure[2]; Green v. Commissioner,supra at 544). However, where the Commissioner pleads in his answer "new matter, increases in deficiency, and affirmative defenses," he bears the burden of proving such allegations. Rule 142(a). Here, the parties agree that the Commissioner bears the burden of proof as to the increases in the deficiencies for 1962 and 1963, and that "the decrease in the deficiency for 1965 constitutes new matter under T.C. Rule 142(a) which shifts the burden to respondent *215 for that year, but only to the extent of the ground for the decrease." Accordingly, as to the first $100,000 of losses disallowed in 1962 and 1963 and as to the losses for 1964 disallowed in the notices, the petitioners bear the burden of proof, and as to the remainder of casino losses disallowed for 1962 and 1963 and the new matter for 1965, the Commissioner bears the burden of proof. The Commissioner concedes that the daily reports accurately reflect the number of chips sold; that they accurately reflect the "actual cash payroll"; and that they accurately reflect the other operating expenses of the casino. In addition, the Commissioner does not challenge the credibility of the witnesses, nor does he contend that the daily reports were "fudged." To establish the taxable income of the casino, exclusive of the checks, the petitioners presented the testimony of San, Pat, Ray, and Ivan, and we found their testimony to be consistent, credible, generally unequivocal, and reliable. The Commissioner's basic objection is that the petitioners have not substantiated the "chips cashed" *216 entry to his satisfaction. However, in our view, the evidence presented at trial convincingly establishes that the casino was operated in a businesslike manner and that the daily reports, which were filled out at the end of each evening's activities, constitute a clear, systematic, and consistent record of the gambling activities throughout the years in issue. They were always prepared with two or more people present, and Sam used them to divide the profits and to prepare his tax returns for the years in issue. See Green v. Commissioner,supra at 546. The fact that the persons generally present at the counting each stood to share in the profits provided each person with an interest for assuring an accurate counting; and the presence of several of them meant that each could check on the accuracy of the other. Although the records containing the notations as to the amount of chips cashed out each day have not been preserved, the testimony consistently establishes that such records were available for the daily counting and were used for such purpose. Moreover, since the amount of chips sold each day was computed by adding the amount of cash in the boxes at the end of the day to the *217 amount of chips cashed as revealed by the notations made at the time, any error in overstating the amount of chips cashed would cause a corresponding increase in the amount of chips sold, and the error would not affect the net profit or loss for the day. Thus, whether we look at the daily net winnings or losses, or whether we look at the individual entries which comprise such figures, we are satisfied that the daily reports accurately reflect the income and expenses of the casino. The Commissioner's reliance on Stein v. Commissioner,supra, and Plisco v. United States,supra, is misplaced since both cases are factually distinguishable. The taxpayer in Stein was a professional gambler who engaged in many gambling activities, including poker, dice, gin rummy, and betting on sports events. His method of accounting for his gambling transactions was to carry two or three bankrolls in different pockets: one for his gambling, one for his partnership gambling, and one for his personal expenses. He allegedly counted such bankrolls at the beginning of each day, and then conducted his transactions out of the appropriate pocket during the day. At the end of the day, he counted the bankrolls *218 in each pocket and then wrote down on napkins, matchbook covers, soap wrappers, or anything else that was available, the amount of his daily winnings or losses. Such records were allegedly kept in a drawer and at the end of the year, totaled, summarized, and then destroyed. At the trial, the taxpayer relied on the summarized records, supported only by his testimony as to the method of their preparation and not supported by any daily systematically kept records, to prove his gambling gains and losses. These records were found on the whole to be unreliable and the truthfulness of the taxpayer's testimony was also questioned. In Plisco, the Commissioner's disallowance of daily net losses was sustained because the court found that the taxpayer's records were summaries of the original records which had been destroyed and were not reliable. In both of these cases, the taxpayers failed to carry their burden of proving the amount of losses they had incurred, whereas here, we are convinced that the casino paid out substantial sums to redeem chips, and that the daily reports accurately reflect such amounts. See Green v. Commissioner,66 T.C. at 545-546. On brief, the Commissioner also *219 seems to be arguing that the excess daily losses can be disallowed under section 165(d). However, it is settled that Sam and Louise are entitled to net their gambling winnings and losses on a yearly basis. Humphrey v. Commissioner,162 F. 2d 853 (5th Cir. 1947), affg. on this issue a Memorandum Opinion of this Court, cert. denied 332 U.S. 817 (1948); Jennings v. Commissioner,110 F. 2d 945 (5th Cir. 1940), cert. denied 311 U.S. 704 (1940); Offutt v. Commissioner,16 T.C. 1214 (1951); Joseph v. Commissioner,43 B.T.A. 273 (1941). The Commissioner also determined that Sam and Louise had unreported income from checks in the amounts of $4,479.54 for 1962, $14,873.77 for 1963, $7,708.18 for 1964, and $468.41 for 1965. Such amounts were based on the Commissioner's conclusion that Sam and Louise had neglected to include such amounts as "collections" on the daily reports. [3] *220 The Commissioner's determination on this issue is presumptively correct, and the petitioners bear the burden of proving the error in such determination. Welch v. Helvering,supra.
To determine whether the petitioners have carried their burden of proving the error in the Commissioner's determination, we must analyze and weigh all of the evidence. On the one hand, the petitioners presented persuasive evidence detailing how the casino was operated and the accounting procedures followed with respect to the checks. On the other hand, the Commissioner presented the testimony of the agents who had audited and investigated the Presley's returns to support his determination that Sam and Louise had unreported income from checks. After carefully analyzing the Commissioner's method of reconstructing the petitioners' income, we are convinced that such method is not reliable. Based on the agents' workpapers, *221 the Commissioner, in his answers, determined that on 13 days in 1962, 16 days in 1963, and 12 days in 1964, the amount Sam reported as collected was less than the amount he should have reported. However, the workpapers also indicate that on many of the days, Sam reported substantially more income than he should have. In the following table, there is set forth the number of days investigated by the agents for each of the year in issue, and their conclusions as to whether Sam over, under, or correctly reported his income for such days: 1962
1963
1964
(1) Correctly reported
income
1
1
1
(2) Over reported income
13
21
20
(3) Under reported
income
11
17
14
In addition, the following summary demonstrates that if the agents' results are annualized, Sam and Louise had substantially less unreported income from checks for 1962 and 1963 than the Commissioner determined, and they substantially over reported their income from checks for 1964: Collections Deter-
Collections on
Unreported
Year
mined by Agents
Daily Reports
Income
1962
$20,029.69
$18,829.00
$ 1,200.69
1963
75,453.67
67,967.00
7,486.67
1964
40,061.34
64,695.00
(24,633.66) There are several possible explanations for the differences between the amounts shown as collections *222 in the daily reports and the agents' computations. For example, the agents could have incorrecty transcribed the date on the checks; they could have incorrectly transcribed the dates or amounts from the tellers' cash books; they could have missed several bad checks completely; or perhaps Sam adjusted some of the entries to reflect a negative collection amount on a prior day. In addition, the agents did not know when the tellers made their entries in the cash books, or whether a check had to be received by a certain time each day to be recorded as cashed that day. Regardless of the explanation of the differences, the facts remain that the Commissioner's method of reconstructing the petitioners' income was clearly misleading and erroneous and that the petitioners presented substantial evidence that they properly accounted for the checks. We are convinced that the error lies in the Commissioner's method of reconstructing the petitioners' income and not in Sam's daily reports. At the trial, the Commissioner sought to introduce into evidence the agents' summaries of the tellers' cash books, copies of the checks cashed (exclusive of the checks admitted by stipulation), and the agents' *223 work-papers. On the basis of hearsay, the petitioners objected to the admission of the copies of such checks to the extent the Commissioner relied on them and the statements of the makers to prove that the checks were negotiated at the Sage Patch and the date of such negotiation. The petitioners also objected to the admission of the agents' summaries of the tellers' cash books based on the best evidence and hearsay rules. It is clear that the agents' handwritten date notations on the checks, their testimony as to where the checks were negotiated, and their handwritten transcriptions of the tellers' cash books all violate the hearsay rule if such evidence were admitted for the truth of the matter asserted therein. Rules 801(c), 802, 804, Federal Rules of Evidence.In addition, the handwritten transcriptions of the tellers' cash books do not constitute either an original or duplicate of such records and, therefore, are not admissible to prove the contents of such books. Rules 1001(3) and (4), 1002, Federal Rules of Evidence. However, it has long been the rule that the Commissioner need not rely solely on admissible evidence for his deficiency determination ( Suarez v. Commissioner,58 T.C. 792, 817 (1972); *224 Rosano v. Commissioner,46 T.C. 681, 687 (1966)), and where the petitioners are questioning the reasonableness of such determination, the Commissioner may introduce evidence as to how he went about computing such deficiency. Weimerskirch v. Commissioner,596 F. 2d 358 (9th Cir. 1979), revg. on another issue 67 T.C. 672 (1977); Avery v. Commissioner,574 F. 2d 467, 468 (9th Cir. 1978), affg. per curiam a Memorandum Opinion of this Court. Such evidence is admissible only to show how the deficiency was computed, and unless it satisfies the general requirements for admissibility, it may not be used for other purposes. As to the two checks Louise deposited in her bank account, the evidence establishes that they were given to Louise by Sam, and the Commissioner determined in his deficiency notice that they represented unreported income from the casino. The Commissioner's determination is presumptively correct, and the petitioners have the burden of proving otherwise. Sam's testimony respecting such checks lacked specificity, and he had difficulty recalling exactly what happened with respect to such checks. Though we understand that memories fade over the years, Sam's testimony is insufficient *225 to prove the checks were not income during 1962 and 1965. In summary, based on all the evidence, we conclude that the petitioners have carried their burden of proving that the "chips cashed" and "collections" entries in the daily reports properly reflected the income of the casino for the years in issue; that the Commissioner has not carried his burden of proving the petitioners are liable for the increased deficiencies for 1962 and 1963; that the Commissioner has not carried his burden as to the new matter; and that the petitioners failed to prove the two checks given to Louise by Sam were not unreported income of the casino. However, the parties have conceded that there were minor mathematical errors in the computation of income for each of the years in issue. These adjustments should be given effect in the computations under Rule 155. Issue 3. Other Gambling Income - 1962 and 1963
FINDINGS OF FACT On their 1962 Federal income tax return, Sam and Louise claimed an "In & around Mobile, Ala. (Loss)" in the amount of $18,485.00, and on their 1963 tax return, they claimed a "Hotel (Loss)" in the amount of $24,070.00. In addition to the operation of the casino, Sam regularly engaged *226 in other gambling activities outside the casino, and both of such losses resulted from Sam's gambling activities outside the casino. Sam had a small pocket notebook in which he contemporaneously recorded all of his winnings and losses from his gambling activities outside the casino. The following is a summary of the notations in the notebook for 1962 and 1963: Type of Bet
Date
or Player
Won
Lost
1962 - In & Around Mobile Loss
5/16
Whitey Rough
0
$ 4,100
8/20
Freddie Barnes
0
1,500
8/20
Whitey Rough
0
5,800
8/26
Whitey Rough
$1,000
0
9/6
Whitey Rough
0
4,800
9/6
Freddie Barness
0
1,800
9/15
Football
0
330
9/22
Football
0
165
9/29
Football
0
440
10/6
Football
1,280 0
10/13
Football
0
660
10/27
Football
0
550
11/3
Football
150
0
11/13
Football
0
330
11/17
Football
0
440
Total
$2,430
$20,915
Loss per return
$18,485
1963 - Hotel Loss
1/13
Ziggie Burns
0
$ 7,000
3/2
Whitey Rough
$ 3,550
0
3/6
Freddie Barnes
0
6,200
3/15
Whitey Rough
450
0
4/12
Whitey Rough
290
0
5/20
Whitey Rough
0
5,800
5/31
Ziggie Burns
0
1,500
5/31
Whitey Rough
400
0
6/5
Whitey Rough
0
2,090
7/15
Whitey Rough
1,000
0
7/20
Whitey Rough
0
2,200
9/5
Ziggie Burns
980
0
9/8
Ziggie Burns
1,100
0
10/5
Junior Moore
0
3,000
11/2
Whitey Rough
1,500
0
11/8
Whitey Rough
500
0
11/9
Cleo Vaughns
1,100
0
12/1
Cleo Vaughns
0
7,150
Total
$10,870
$36,640
Loss per return
$24,070 For *227 1962, the Commissioner disallowed the excess gambling losses from Sam's other gambling activities because Sam did not establish that "any amount constitutes an ordinary and necessary expense or was expended for the purpose designated." In his notice of deficiency for 1963, the Commissioner disallowed the excess gambling losses from Sam's other gambling activities because section 165(d) limits losses from wagering transactions to the extent of the gains from such transactions. OPINION Section 165(d) provides "Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions." We must decide whether the income from the casino may be offset by the losses from Sam's other gambling activities. The petitioners argue that they are entitled to net such winnings and losses because Sam was a professional gambler, and the Commissioner argues that such items may not be netted. Apparently, the Commissioner also means to question the adequacy of Sam's records to substantiate his losses, but we are satisfied that the records maintained by him contemporaneously provide adequate substantiation for such losses. [4] *228 At the time the predecessor of section 165(d) was first enacted in 1934, the House Ways and Means Committee explained the reasons for the provision as follows: Existing law does not limit the deduction of losses from gambling transactions where such transactions are legal. Under the interpretation of the courts, illegal gambling losses can only be taken to the extent of the gains on such transactions. A similar limitation on losses from legalized gambling is provided for in the bill. Under the present many taxpayers take deductions for gambling losses but fail to report gambling gains. This limitation will force taxpayers to report their gambling gains if they desire to deduct their gambling losses.[H. Rept. No. 704, 73d Cong., 2d Sess. (1934), 1939-1 (Part 2) C.B. 554, 570.] For a similar statement, see S. Rept. No. 558, 73d Cong., 2d Sess. (1934), 1939-1 (Part 2) C.B. 586, 605. Over the years, based in part on such *229 legislative history, the courts have held that "wagering transactions" include all gambling activities, whether legal or illegal, or whether the wagering occurred as part of a trade or business or for "sport and recreation." E.g., Humphrey v. Commissioner,162 F. 2d 853 (5th Cir. 1947), affg. on this issue a Memorandum Opinion of this Court, cert. denied 332 U.S. 817 (1948); Jennings v. Commissioner,110 F. 2d 945 (5th Cir. 1940), cert. denied 311 U.S. 704 (1940); Offutt v. Commissioner,16 T.C. 1214 (1951); Joseph v. Commissioner, 43 B.T.A. 273 (1941); Skeeles v. United States,118 Ct. Cl. 362, 95 F. Supp. 242 (1951), cert. denied 341 U.S. 948 (1951); see also Green v. Commissioner,66 T.C. 538, 548 (1976); Gordon v. Commissioner,63 T.C. 51, 81 (1974), revd. per curiam on another issue 572 F. 2d 193 (9th Cir. 1977), cert. denied 435 U.S. 924 (1978). For example, in Jennings v. Commissioner,supra, the petitioner was in the trade or business of gambling, and the Court held the predecessor of section 165(d) applied to such gambling winnings and losses. In Offutt v. Commissioner,supra at 1214, the petitioner's business activity "consisted, in large part, of 'handicapping' horses in *230 each race, that is, estimating their chances, and 'making future book,' that is, setting up a list of the horses in each race with the odds which he would be willing to accept." Under such circumstances, we specifically held that the predecessor of section 165(d) applied to such income even though the petitioner's trade or business was that of gambling. In Joseph v. Commissioner,supra, the taxpayer was engaged in the trade r business of wagering on horses. We held such activity constituted "wagering transactions" within the meaning of the predecessor of section 165(d). Just recently, in Gordon v. Commissioner,supra, in determining whether a taxpayer's income from a gambling business was averagable income within the meaning of the income averaging provisions, we defined "wagering transaction," based principally on the cases interpreting section 165(d), to include income from a gambling trade or business. Accordingly, we conclude that the casino income in this case represents gains from wagering transactions within the meaning of section 165(d). We must now decide whether the excess wagering winnings from the casino may be netted against Sam's other wagering losses. The Commissioner *231 argues that such losses may not be used to offset the casino income as a matter of law because such losses were "personal" gambling losses. However, such argument is not persuasive. Sam was a professional gambler from 1933 until the time of trial. Though he admittedly was in the trade or business of operating an illegal casino, he was also in the trade or business of being a professional gambler. See Skeeles v. United States,supra.His other gambling activities were not recreational, occasional, or casual, but constituted an actual trade or business to which he devoted a considerable amount of time. The law is clear that the petitioners are entitled to net all of their business wagering winnings and losses. Humphrey v. Commissioner,supra;Drews v. Commissioner,25 T.C. 1354, 1355 (1956); Skeeles v. United States,supra.Moreover, regardless of whether we characterize such gambling activities as personal or business, the case law is equally clear that all wagering losses are deductible to the extent of wagering gains. For example, in both Jennings and Joseph, the court held that individual gambling losses could be used to offset gambling income from a partnership engaged in *232 the trade or business of gambling. See also Humphrey v. Commissioner,supra; Offutt v. Commissioner,supra; Skeeles v. Commissioner,supra.Accordingly, we hold that the petitioners are entitled to a deduction of $18,485.00 in 1962 for the "In & Around Mobile, Ala. (Loss)" and a deduction of $24,070.00 in 1963 for the "Hotel (Loss)." Issue 4. Other Gambling Income - 1965
FINDINGS OF FACT During 1965, Sam played gin rummy with Fredrick G. Levin. On May 10, 1965, Sam won $4,500 from Mr. Levin, which Mr. Levin paid to him in two checks: one dated May 10, 1965, in the amount of $2,250, and one dated June 1, 1965, in the amount of $2,250. Over the years, Mr. Levin and Sam have played gin rummy on numerous occasions, and in the long run, Sam lost more than he won. In his notice of deficiency, the Commissioner determined that Sam and Louise realized additional gross income of $4,500 in 1965 as a result of the checks from Mr. Levin. OPINION The petitioners admit that Sam won $4,500 from Mr. Levin in 1965, but they argue that in such year Sam lost more than $4,500 to Mr. Levin. The Commissioner's determination that Sam and Louise had such additional income is presumptively correct, and *233 the petitioners bear the burden of proving that Sam's alleged offsetting losses were in fact sustained and the amount thereof. The issue is a factual one to be decided on the basis of all the evidence. Schooler v. Commissioner,68 T.C. 867, 869 (1977); Green v. Commissioner,66 T.C. 538, 544 (1976). Section 1.6001-1(a), Income Tax Regs., imposes on all taxpayers the duty of maintaining "permanent books of account or records * * * as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information." Unlike 1962 and 1963, Sam did not keep any records of his other gambling transactions in 1965. In addition, in his testimony, Sam failed to prove any specific gambling losses in 1965. There is absolutely no evidence as to how much he won and lost in 1965 from all of his other gambling activities, and the evidence is equally vague and unsatisfactory as to the specific amounts he won from and lost to Mr. Levin in 1965. As a consequence, there is absolutely no basis for estimating his alleged 1965 losses. Though we accept that over the years Sam lost more to Mr. Levin than he won, *234 such fact does not establish what happened in 1965. As we stated in Schooler v. Commissioner,supra at 871: Deductions for other purposes are not allowable unless substantiated by adequate records. * * * It is clear that for such purposes, the kind of general evidence presented by the petitioner in this case is not sufficient. There is surely no reason to treat taxpayers such as the petitioner who claim to have sustained wagering losses more favorably than other taxpayers, by allowing a deduction for wagering losses when the evidence is vague and inadequate. We recognize that this Court has applied the rule of Cohan v. Commissioner,39 F. 2d 540, 543-544 (2d Cir. 1930), and permitted deductions based on estimates where it was convinced that net losses were in fact sustained; however, the record in the case before us provides no satisfactory basis for estimating the amount of the petitioner's winings or losses, nor does it convince us that in fact his losses exceeded his unreported gains. * * * Accordingly, we hold that Sam and Louise had additional gross income in 1965 of $4,500 from Sam's other gambling activities. Issue 5. Unreported Bar Income
FINDINGS OF FACT During the *235 years in issue, the petitioner also operated a bar and lounge at the Sage Patch. Generally, one person was employed in the bar, and such employee acted as a bartender and waitress. The manager of the bar was Albert "Larry" Slaughter, known to everybody as Slick. At the bar, whiskey, beer, soft drinks, and various miscellaneous items, such as nuts, were available. The bar was equipped with an automatic whiskey dispenser, which metered the number of drinks dispensed each evening. The bar was also equipped with a cash register to record sales. The cash register was equipped with three specific keys, a whiskey key, a beer key, and a miscellaneous key, which were used to register sales in each category. At the beginning of the evening, Slick gave the bartender a predetermined amount of cash with which to open that evening's business. A patron of the bar was generally required to pay for his drinks in cash. The bartender was required to record each sale on the cash register according to the type of sale, i.e., whiskey, beer, or miscellaneous. The bartender also served mixed drinks, beer, and soft drinks to players in the casino. Upon approval by Sam, Pat, Ray, Morris, or Slick, *236 players received complimentary drinks from the bar. Normally, a player was not required to pay for his drinks. If a player was given a free whiskey drink, the bartender was required to ring up the sale as a whiskey sale and have the cash register receipt signed by the person who authorized the free drink. The signed cash register receipt was then placed in the cash register drawer. Such sales were denominated "give aways," and they were registered at their retail price. Upon request, the players were also given free beer and soft drinks, if the requisite approval was received; but these give aways were not rung up on the cash register. At the end of the evening when the bartender closed out the cash register, she was required to have cash and signed register tapes, adjusted for the amount of cash she opened with, equal to the total dollar amount of sales registered on the cash register. In addition, the dollar amount of registered whiskey sales had to be equivalent to the number of drinks dispensed on the metered whiskey dispensing machine. She did not have to account for give aways of beer and soft drinks. The cash register was usually checked out by Slick, but on occasion, either *237 Pat or Ray also checked the cash register against the nightly proceeds. After the register had been closed out, Slick, and occasionally Pat or Ray, prepared a "daily ticket" for the bar. The first figure on the daily ticket was the bar bankroll, which consisted of prior sales minus prior operating expenses. Separately stated thereunder were the whiskey, beer, and miscellaneous sales for the evening, as taken from the cash register. Whiskey sales included whiskey give awasy. The total daily sales were added to the beginning bankroll, and total cash disbursements (or the daily operating expenses, such as laundering of linens, and beer, whiskey, and soft drink purchases) were subtracted from such bankroll. The resulting figure represented the closing balance, which was then used as the following day's opening balance. At the bottom of the daily ticket, a circled dollar amount indicated the dollar value of whiskey give aways for the evening. All of the receipts for cash disbursements were attached to the daily ticket. Every night, a daily ticket for the bar was prepared in this manner. Slick was primarily responsible for the preparation of such ticket, and as a general rule, Sam *238 did not participate in nightly accounting procedures for the bar. In addition to providing patrons with complimentary drinks, Sam also provided a weekly buffet dinner for his gambling patrons at which he served free food and drinks. He also frequently gave bottles of liquor to regular patrons, especially at Christmas. At the end of the month, the daily tickets and all attached receipts were given to W. W. Kerr, a public accountant, for the purpose of preparing and filing monthly State sales tax returns. An employee of Mr. Kerr, Trinell Ros, used such records for each of the years in issue to prepare the Mississippi sales tax returns. Ms. Ros was informed that the whiskey sales on the daily tickets did not include give aways, so she added the give aways to the whiskey sales in computing gross sales and the sales tax liability. During the audit, Sam provided agent Waterbury with no records relating to the operations of the bar and lounge; accordingly, the agent reconstructed the income from the bar as follows: 1962
1963
1964
1965
Whiskey sales
$10,173.80
$10,463.50
$14,747.23
$18,271.20
Beer sales
8,324.02
8,458.38
9,368.90
14,537.03
Total sales
$18,497.82
$18,921.88
$24,116.13
$32,808.23
Whiskey purchases
$ 5,992.37
$ 6,163.00
$ 8,686.12
$10,769.63
Beer purchases
3,654.24
3,713.23
3,402.94
7,465.71
Total purchases
$ 9,646.61
$ 9,876.23
$12,089.06
$18,235.34
Gross profit
8,851.21
9,045.65
12,027.07
14,572.89
(total sales
less total
purchases)
In *239 computing such figures, he relied primarily upon the monthly Mississippi sales tax returns filed by Sam. Based on such tax returns for 1963 through 1965, he computed the dollar amount of sales for both beer and whiskey for such years. For 1962, he knew the dollar amount of sales tax paid, and using a ratio of sales tax paid over gross sales for 1963 through 1965, he computed the gross beer and whiskey sales for 1962. To compute the operating expenses of the bar for 1965, the agent obtained records of beer and whiskey purchases by the Sage Patch from the Mississippi Sales Tax Commission, and based on such records, he computed the dollar amount of beer and whiskey purchases. He used the 1964 Mississippi Sales Tax Commission records to compute the beer purchases for 1964 in the same manner, but such records were not available for the 1964 whiskey purchases. Thus, he estimated the 1964 whiskey purchases by assuming that whiskey purchases in 1964 were in the same proportion to 1964 whiskey sales as was the case in 1965. For 1962 and 1963, he computed the whiskey purchases in the same manner as he did the 1964 purchases. For 1962 and 1963 beer purchases, no records were available; *240 accordingly, he estimated the beer purchases in such years by assuming that they were in the same proportion to 1962 and 1963 beer sales as were the average beer purchases to beer sales for 1964 and 1965. The agent did not allow for any other expenses, and he made no allowance for give aways. At the trial of this case, the petitioner presented his daily tickets for the bar for 1964 and 1965. Attached to such tickets were receipts for cash disbursements. These were the records that Ms. Ros had used to compute the sales tax returns, and prior to trial, she had been given such records and had been asked to audit them and prepare a profit and loss statement. In preparing such statement, she added the value of the give aways to the whiskey, beer, and miscellaneous sales, and then she allowed the value of the giveaways as a deduction. The following is a summary of Ms. Ros' results: 1964
1965
Sales
Whiskey
$10,325.97
$12,758.40
Beer
8,556.75
12,647.96
Miscellaneous
920.20
1,269.50
Give aways
5,309.86
6,429.20
Gross sales
25,112.78
$33,105.06
Less: Give aways
5,309.86
6,429.20
Purchases and
expenses
20,307.81
25,273.88
Profit or (loss)
$ ( 504.89)
$ 1,401.98
Ms. Ros attributed the minor differences between the gross *241 sales reflected in the sales tax returns and the profit and loss statement to mathematical errors. She was not aware, at the time she computed the sales tax return or at the time she prepared the profit and loss statement, that the give aways were already included in the whiskey sales. During 1964, Sam was required to supplement the bar bankroll in the following amounts because the bar income was insufficient: Date
Amount
4/29/64
$197.00
5/6/64
230.00
5/20/64
140.00
12/30/64
620.00
OPINION The issue for decision is whether the petitioners had unreported income from the operation of the bar and lounge at the Sage Patch. Since Sam and Louise produced no records relating to the bar during the audit, the Commissioner reconstructed the income and expenses generated by the bar. See secs. 6001, 446; sec. 1.446-1, Income Tax Regs. As detailed in our Findings of Fact, such income and expenses were estimated based on State sales tax returns, State Sales Tax Commission records, and projections based on such records. The Commissioner's determination that the bar operated at a profit is presumptively correct, and the petitioners bear the burden of proving such determination is in error. Rule 142; Welch v. Helvering,290 U.S. 111 (1933). *242 To establish that the bar did not operate at a profit, the petitioners presented the testimony of Slick and several other employees of the bar and casino. Their testimony established that the bar was operated in a businesslike manner and that a systematic accounting procedure was used to determine profits and losses. At trial, the petitioners also produced the daily tickets for the bar with the attached receipts for cash disbursements for 1964 and 1965. In the statement of profit and loss prepared by Ms. Ros, it appears that the bar operated at a loss in 1964 and at a small profit in 1965. In preparing such statement and the State sales tax returns, Ms. Ros was not aware that the give aways had been included twice: once as part of the whiskey sales and once as a separate item. If the give aways are properly accounted for in the sales tax returns and in the profit and loss statements, it is clear that the bar did not operate at a profit in 1964 and 1965. Finally, Sam, Pat, Ray, Slick, and the bartender all testified that because of the give aways, the bar did not operate at a profit for any of the years in issue. Their opinions are fully corroborated by the daily tickets for 1964 *243 and 1965. Though the petitioners did not produce any records for 1962 and 1963, Slick testified that the bar was operated in the same manner in such years as in 1964 and 1965. Ms. Ros confirmed that in 1962 and 1963 she used daily tickets to compute the sales tax returns. Despite all of this evidence, the Commissioner insists that his determination that the bar operated at a profit for the years in issue should be sustained. He emphasizes that at the time of the audit, Sam and Louise provided the auditing agents with no records, and that therefore, it was reasonable to reconstruct their income from the bar. Under the circumstances, the propriety of reconstructing their income can hardly be questioned. However, at trial, the petitioners presented persuasive evidence that the bar did not operate at a profit. The Commissioner's method grossly understimated the expenses incurred in operating the bar, since it took into consideration only purchases of beer and whiskey, and not the many other substantial expenses reflected in the receipts attached to the daily tickets. In addition, he made absolutely no adjustment for the give aways in his computation. The daily tickets for 1964 *244 and 1965 establish that several thousand dollars worth of whiskey was given away. The Commissioner contends that some of the bar's expenses were deducted on the daily reports of the casino, but the evidence does not support such contention. The common expenses of the bar and casino, such as utility bills, and expenses solely attributable to the casino, such as the cost of dice, were deducted on the daily reports of the casino and not on the daily tickets of the bar. However, expenses solely attributable to the bar, such as the cost of soft drinks and the cost of laundering linens, were deducted only on the daily tickets of the bar. The Commissioner points us to no specific instance where the same expense was deducted on the daily tickets of the bar and the daily reports of the casino. Finally, the daily tickets establish that the Commissioner's method of reconstructing the bar income grossly overestimated the profit from the bar in 1964 and 1965, and since the income and expenses for 1962 and 1963 were based in part on projections from 1964 and 1965, his determinations for 1962 and 1963 have incorporated the same errors. Using the actual income and expenses of the bar for 1964 *245 and 1965 and projecting such experience back to 1962 and 1963, as did the Commissioner, it is reasonable to conclude that the bar also operated at a loss in 1962 and 1963. Accordingly, based on all of the evidence, we hold that the petitioners have carried their burden of proving that their expenses from the bar at least equaled their income and that, therefore, they had no taxable income from the bar during the years in issue. [5]
Issue 6. Automobile Expenses
FINDINGS OF FACT For the years in issue, the following automobile expenses were deducted by Sam and Louise: Year
Amount
1962
$3,300.00
1963
3,300.00
1964
3,300.00
1965
3,000.00
For 1962, 1963, and 1964, they computed such expenses by multiplying 30,000 miles by 11 cents per mile. For 1965, they computed the deduction by multiplying 30,000 miles by 10 cents per mile. At the trial, Sam acknowledged that, of the 30,000 miles traveled each year, 7,750 miles were the result of commuting between his home and his principal place of business. *246 Many of the remaining miles were traveled between Mobile, Ala., and Pascagoula, Miss.
In his notices of deficiency, the Commissioner disallowed the deductions because the petitioners had not established the business purpose nor substantiated the amount of the business expenses. OPINION The issue for decision is whether Sam and Louise are entitled to deduct as a business expense for each of the years in issue the cost of driving 22,250 miles. The petitioners argue that such expenses were ordinary and necessary business expenses, whereas the Commissioner argues that the petitioners have not established the expenses were business expenses and that they have not substantiated the number of miles traveled. We agree with the Commissioner. Section 162allows a deduction for the ordinary and necessary expenses paid during the taxable year in carrying on a trade or business. To prevail, the petitioners must show that the claimed business expenses were not incurred primarily for personal purposes ( Henry v. Commissioner,36 T.C. 879, 884 (1961)), and that there was a proximate relationship between the expenses and Sam's business. Henry v. Commissioner,supra;Reed v. Commissioner,35 T.C. 199 (1960); *247 Larrabee v. Commissioner,33 T.C. 838 (1960). The issue is primarily one of fact to be resolved based on all of the facts and circumstances. Commissioner v. Heininger,320 U.S. 467 (1943); Schulz v. Commissioner,16 T.C. 401 (1951). The petitioners bear the burden of proof (Rule 142); Welch v. Helvering,290 U.S. 111 (1933), and on this record, they have failed to carry such burden. The evidence does not establish how many miles Sam drove each year and how many of such miles were traveled for personal reasons. Though Sam claimed he traveled 30,000 miles in pursuit of his gambling business, at the trial, he admitted that 7,750 of such miles were traveled in commuting between his home and the Sage Patch. As to the remaining 22,250 miles, the evidence does not establish that Sam did in fact travel such miles, or that the purpose of such travel was business related, rather than personal. The petitioners' reliance on Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930), is misplaced since they have not established that any of the expenses were business expenses. On this record, we hold that the petitioners are not entitled to the deduction for automobile expenses for any of the years *248 in issue. Issue 7. Telephone Expense
FINDINGS OF FACT Sam and Louise claimed deductions for telephone expenses on their 1962, 1963, and 1964 Federal income tax returns as follows: Year
Amount
1962
$400.00
1963
400.00
1964
258.32
Sam estimated the amounts of the expenses for 1962 and 1963. In his notices of deficiency, the Commissioner disallowed the deductions because Sam and Louise had not substantiated the amount nor the business purpose of the expenses. OPINION Section 162 allows a deduction for all ordinary and necessary business expenses paid during the taxable year. The petitioners bear the burden of proving they are entitled to deductions for telephone expenses. The petitioners presented no evidence substantiating that Sam incurred or paid such telephone expenses or that such expenses were business related. The petitioners' reliance on Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930), is misplaced since they have not established that any of the expenses were business related. Accordingly, we hold that the petitioners are not entitled to a deduction for telephone expenses for 1962, 1963, or 1964. Issue 8. Traveling Expenses
FINDINGS OF FACT On their 1962 through 1965 Federal *249 income tax returns, Sam and Louise claimed deductions for traveling expenses as follows: Total
Traveling
Year
Hotel
Meals
Tips
Expenses
1962 $ 364.04
$198.00 $ 33.00 $ 595.04
1963
700.00
210.00
70.00
980.00
1964
388.48
159.00
53.00
600.43 a
1965
1,068.43
249.00
120.00
1,437.43
For 1962, 1963, and 1965, Sam had hotel receipts for the following expenses: Year
Hotel
Meals
Telephone
1962
$249.37
$15.06
$132.57
1963
560.65
5.82
250.44
1965
840.57
8.67
55.77
Included in the hotel expenses was a State sales tax. Most of the hotel bills were incurred when Sam traveled to Alabama. In his notices of deficiency, the Commissioner disallowed the deductions for travel because Sam and Louise had not substantiated the amount nor the business purpose of the expenses. OPINION Section 162 allows a deduction for traveling expenses, including expenses for meals and lodging, if (1) the expenses are reasonable and necessary, (2) they are incurred while away from home, and (3) they are incurred in pursuit of business. Commissioner v. Flowers,326 U.S. 465, 470 (1946). However, for taxable years ending after December 31, 1962, deductibility of such expenses is limited by the substantiation *250 requirement of section 274(d), which provides in part: No deduction shall be allowed-- (1) under section 162 * * * for any traveling expense (including meals and lodging while away from home), * * *
unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, * * * (C) the business purpose of the expense or other item * * * See Rev. Act of 1962, Pub. L. 87-834, sec. 4(c), 76 Stat. 977. Under the regulations, the petitioners are required to substantiate the amount, time, place, and business purpose of Sam's travel expenses "by adequate records or by sufficient evidence corroborating his own statement." Sec. 1.274-5(c)(1), Income Tax Regs. To meet the "adequate records" requirement, a taxpayer must maintain an account book, diary, statement of expense, or similar record prepared contemporaneously with the expenditure and, in certain situations, produce documentary evidence, which ogether establish each element of an expenditure. Sec. 1.274-5(c), Income Tax Regs.; Sanford v. Commissioner,50 T.C. 823 (1968), affd. per curiam 412 F. 2d 201 (2d Cir. 1969), *251 cert. denied 396 U.S. 841 (1969). Specifically, the regulations provide the following requirements for substantiating the business purpose of the expenditures: (b) Substantiation of business purpose. In order to constitute an adequate record of business purpose within the meaning of section 274(d) and this subparagraph, a written statement of business purpose generally is required.However, the degree of substantiation necessary to establish business purpose will vary depending upon the facts and circumstances of each case. Where the business purpose of an expenditure is evident from the surrounding facts and circumstances, a written explanation of such business purpose will not be required. * * * [Sec. 1.274-5(c)(2)(ii)(b), Income Tax Regs.] In the absence of adequate records, a taxpayer may alternatively establish an element of an expense: (i) By his own statement, whether written or oral, containing specific information in detail as to such element; and (ii) By other corroborative evidence sufficient to establish such element. If such element is * * * the cost, time, place, or date of an expenditure, the corroborative evidence shall be direct evidence, such as a statement in *252 writing or the oral testimony of persons entertained or other witness setting forth detailed information about such element, or the documentary evidence described in subparagraph (2) of this paragraph. If such element is * * * the business purpose of an expenditure, the corroborative evidence may be circumstantial evidence. [Sec. 1.274-5(c)(3), Income Tax Regs.; emphasis supplied.] Sanford v. Commissioner,supra; Ashby v. Commissioner,50 T.C. 409 (1968). The evidence presented by the petitioners fails to establish for each of the years in issue that any of the traveling expenses were incurred in the pursuit of business. The only explanation proffered by the petitioners for the business purpose of such expense was that Sam believed his pysical presence in cities like Mobile, Ala., helped his business in the casino. Surely, based on such testimony, the relationship between the expenditures and his business is far too tenuous to conclude that they were ordinary and necessary business expenses. The need for more specific evidence is especially clear when the evidence also indicates that Sam pursued personal endeavors while on such trips. In addition, as to the years 1963, 1964, and *253 1965, the evidence submitted by the petitioners does not come close to the type of substantiation required by section 274(d), either under the adequate records standard or the "sufficient evidence corroborating his own statement" standad. Specifically, under both standards, the petitioners have not established the business purpose of the expenditures. Finally, the petitioners. reliance on Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930), for 1962 is misplaced since they have not established that the traveling expenses were incurred in the pursuit of business. Moreover, for 1963, 1964, and 1965, Congress specifically rejected the rule of Cohan when it enacted section 274(d): This provision is intended to overrule, with respect to such expenses the so-called Cohan rule. In the case of Cohan v. Commissioner,39 F. 2d 540 (C.A. 2d, 1930), it was held that where the evidence indicated that a taxpayer had incurred deductible expenses but their exact amount could not be determined, the court must make "as close an approximation as it can" rather than disallow the deduction entirely. Under your committee's bill, the entertainment, etc., expenses in such a case would be disallowed entirely. *254 The requirement that the taxpayer's statements be corroborated will insure that no deduction is allowed solely on the basis of his own unsupported, self-serving testimony. * * * [H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 427; S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 741.] See also Sanford v. Commissioner,50 T.C. at 828; Ashby v. Commissioner,50 T.C. at 415. Accordingly, we hold the petitioners are entitled to no deduction for traveling expenses for each of the years in issue. Issue 9. Bad Debt
FINDINGS OF FACT On their Federal income tax returns, Sam and Louise claimed a bad debt deduction of $2,100.00 for 1964 and $5,644.15 for 1965. For 1964, the deduction was based on two separate debts: one from Robert Coleman in the amount of $100.00, and one from William Petrie in the amount of $2,000.00. A check drafted by Mr. Petrie to cash and endorsed by Sam for the amount of $1,930.00, dated December 16, 1963, had been dishonored because of insufficient funds. Sam was unsure when he loaned the $2,000.00 to Mr. Petrie. At the trial and on brief, the petitioners conceded that the debt from Mr. Coleman to Sam did not become worthless *255 in 1964. For 1965, the bad debt deduction was based on two loans: one to C. A. McGillen, Jr., in the amount of $3,574.15, and one to Coast Development, Inc., in the amount of $2,070.00. None of the Loans was evidenced by a promissory note. In his notices of deficiency, the Commissioner disallowed the bad debt deductions, because the petitioners had not established that the loans were made or when they became worthless. OPINION Section 166(a)(1)provides a deduction for any debt which becomes wholly worthless within the taxable year. The regulations require the existence of a bona fide debt, which is defined as "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs.; Malinowski v. Commissioner,71 T.C. 1120 (1979). In addition, for a creditor to establish that a debt has become worthless, he must prove that he made every reasonable effort to locate the debtor and to collect the debt. Allen-Bradley Co. v. Commissioner,112 F. 2d 333, 334-335 (7th Cir. 1940), affg. 39 B.T.A. 1243 (1939); A. Finkenberg's Sons, Inc. v. Commissioner,17 T.C. 983, 984 (1951); *256 Runyon v. Commissioner,8 T.C. 350, 357 (1947); Brickell v. Commissioner,17 B.T.A. 711, 712-713 (1929). However, if the creditor can establish that the debtor's financial position was such that attempts to collect would have been useless, then the creditor is excused from collection activities, since the law does not require a creditor to engage in futile acts. Sec. 1.166-2(b), Income Tax Regs.; Sherman v. Commissioner,18 T.C. 746, 752 (1952); American Warehouse Co. v. Commissioner,19 B.T.A. 8, 11-12 (1930). Whether a debt is worthless depends upon an analysis of all the pertinent facts and circumstances. Mueller v. Commissioner,60 T.C. 36 (1973), revd. on other issues 496 F. 2d 899 (5th Cir. 1974); Skolnik v. Commissioner,55 T.C. 1055 (1971). The petitioners bear the burden of proving they are entitled to the deductions (see Malinowski v. Commissioner,supra), and based on this record, they have failed to carry such burden. For 1964, the evidence establishes that Mr. Petrie owed Sam $2,000.00 and a check in the amount of $1,930.00 dated December 16, 1963, had been dishonored by the bank because of insufficient funds. The evidence also establishes that Sam had loaned $3,574.15 *257 to C. A. McGillen, Jr., and that he loaned $2,070.00 to Coast Development, Inc. However, there is absolutely no evidence that Sam attempted to collect such loans, or that the debtors were insolvent or otherwise unable to repay the loans. Based on the evidence presented, we hold that the petitioners have not established the debts were worthless in 1964, 1965, or any other years. Issue 10. Dependency Exemption
FINDINGS OF FACT On their 1964 and 1965 Federal income tax returns, Sam and Louise claimed a dependency exemption for Sam's sister, Doris Presley, who was an invalid during such years. Sam had provided for her full support for her entire life, and during 1964 and 1965, he provided all of her support. In his notices of deficiency, the Commissioner disallowed the dependency exemptions for Doris Presley because Sam and Louise had not established that they furnished more than one-half of her support during 1964 and 1965.
OPINION The issue for decision is whether the petitioners are entitled to claim dependency exemptions for 1964 and 1965 for Doris Presley, Sam's sister. The Commissioner argues that the petitioners have not established that they provided over half of her support. *258 Section 151(a) allows a deduction for personal exemptions. Section 151(e)(1)(A) provides an exemption for each dependent "whose gross income for the calendar year in which the taxable year of the taxpayer begins is less than $600." Under section 152(a)(1) and (8), a dependent is defined to include a taxpayer's sister or sister-in-law over half of whose support for the taxable year was received from the taxpayer. The petitioners bear the burden of proving they are entitled to the exemptions (Rule 142), and based on the entire record, we conclude that they have met their burden. The evidence establishes that Doris Presley was an invalid her entire life and that Sam and Louise provided all of her support for 1964 and 1965.The Commissioner, while not actually disputing such evidence, contends that it is insufficient because the petitioners have not established exactly how much was expended for her total support.In cases where two or more taxpayers disagree over which of them is entitled to a dependency exemption, it is essential that the dollar amount of the dependent's support be established and that each party prove exactly how much of such support was provided by him. See, e.g., *259 Seraydar v. Commissioner,50 T.C. 756, 760 (1968); Stafford v. Commissioner,46 T.C. 515, 518 (1966). However, where there are no conflicting claims for an exemption, and where the evidence clearly establishes that the taxpayers claiming the exemption provided all of the dependenths support, it is not essential that the taxpayers establish exactly how much was expended for the dependent's total support. Boettiger v. Commissioner,31 T.C. 477, 486 (1958); Wayman v. Commissioner,14 T.C. 1267, 1270 (1950). For such reasons, the Commissioner's reliance on Seraydar v. Commissioner,supra, and Stafford v. Commissioner,supra, is misplaced. On brief, the Commissioner also raised for the first time questions about wher Doris Presley lived and whether she had other sources of income, but such matters were not pursued no raised by him prior to or at the trial. Sam testified unequivocally that he provided her full support during 1964 and 1965, and such testimony was the only evidence presented on this issue; it would be unrealistic and unfair of us to require the petitioners at trial to anticipate every hypothetical objection which the Commissioner may wish to raise on brief. Accordingly, *260 on the basis of this record, we hold that the petitioners are entitled to dependency exemptions for Doris Presley in 1964 and 1965. Issue 11. Louise's Liability
FINDINGS OF FACT During the years in issue, Louise, who died on January 2, 1977, was a housewife. Sam periodically gave her sums of money to run their household, but she did not participate in her husband's businesses. For 1963 and 1964, the deficiency notices sent to Sam were addressed as follows: Mr. Sam Presley, Sr. 211 Balmoral Street Biloxi, Mississippi 39531 For 1963 and 1964, the Commissioner did not send a separate or joint notice of deficiency to Louise. OPINION On brief, the Commissioner conceded that there was no fraud on the part of Louise, and therefore, we need only address the estate's liability for the deficiencies.For 1962 and 1965, we must decide whether the estate is entitled to be relieved of liability for the deficiencies under section 6013(e)(1), which provides: (e) Spouse Relieved of Liability in Certain Cases-- (1) In general.--Under regulations prescribed by the Secretary, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross *261 income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefitted directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. The petitioners bear the burden of proving Louise complied with each of the three conditions for each of the years in issue. Rule 142; Quinn v. Commissioner,62 T.C. 223, 229-230 (1974), affd. 524 F. 2d 617 (7th Cir. 1975); Sonnenborn v. Commissioner,57 T.C. 373, 380-382 (1971). The Commissioner concedes that Louise met the first two requirements, *262 but the estate is not relieved of liability because the petitioners have not established that Louise met the last of such conditions. To meet the requirements of section 6013(e)(1)(C), the petitioners were required to prove that, taking into consideration whether Louise significantly benefitted from the omission from gross income, and taking into account all of the other facts and circumstances, it would be inequitable to hold her liable for the deficiencies. The only evidence presented is that Louise had no significant sources of income other than that which Sam gave her periodically to run their household. Such evidence does not address whether she significantly benefitted from the omission from income or where the equities lie in this case. On the basis of this record, we are constrained to hold that the petitioners have failed to prove that it would be inequitable to hold the estate liable for the deficiencies for 1962 and 1965. As to 1963 and 1964, the Commissioner argues, for the first time on brief, that if we conclude that Sam and Louise filed joint returns for 1963 and 1964, then the estate is automatically liable for any deficiencies for such years as redetermined by *263 us. The Commissioner further argues that the estate is not relieved of liability because it did not affirmatively raise the issue of whether Louise was an innocent spouse for such years. Though we have held that Sam and Louise did file joint returns for 1963 and 1964, it does not follow that the estate is liable for the deficiencies for such years. Since 1918, spouses have been permitted to file joint income tax returns. Rev. Act of 1918, 65th Cong., 3d Sess., ch. 18, sec. 223, 40 Stat. 1074; sec. 6013.In 1924, Congress established the deficiency procedures under which the Commissioner was authorized to notify the taxpayer of any deficiency. Rev. Act of 1924, 68th Cong., 1st Sess., ch. 234, sec. 274(a), 43 Stat. 297. Over the next few years, the law became increasingly unclear as to whether spouses who filed joint returns were jointly and severally liable for the tax. In 1938, Congress clarified the law by expressly providing that spouses were jointly and severally liable for the tax if they filed a joint return. Rev. Act of 1938, 75th Cong., 3d Sess., ch. 289, sec. 51(b), 52 Stat. 476; H. Rept. No. 1860, 75th Cong., 3d Sess. (1938), 1939-1 (Part 2) C.B. 728, 749. At the same *264 time, Congress decided to allow the Commissioner, in his discretion, to send a joint notice of deficiency to spouses instead of separate notices. Rev. Act of 1938, supra, sec. 272(a), 52 Stat. 535. As explained by the House Ways and Means Committee: To conform to section 51(b) of the bill, which expressly provides for joint and several liability in the case of a husband and wife who file a joint return, express provision is made in section 272(a) of the bill for the sending of a joint notice of deficiency if the Commissioner in his discretion desires to send a joint notice instead of separate notices of the deficiency. This accords with the established procedure under the Revenue Act of 1936 and prior Acts. The committee feels, however, that, in the interests of fairness, an exception to such established procedure should be made in cases where, subsequent to the filing of the joint return and prior to the notice of deficiency, the spouses have established separate residences and notice of such fact has been given to the Commissioner. The last sentence of section 272(a) of the bill accordingly provides that a single joint notice may be sent in the general case but that, if the Commissioner *265 has been notified by either spouse that separate residences have been established, then, in lieu of the single joint notice, duplicate originals must be sent by registered mail to each of the spouses at his last known address. [H. Rept. No. 1860, supra, 1939-1 (Part 2) C.B. at 763; empasis supplied.] The substance of such provisions was enacted as part of the Internal Revenue Code of 1954. Section 6013(d)(3) provides for joint and several liability where spouses file joint returns.Section 6212(a)(1) generally provides that if the Commissioner determines there is a deficiency in certain taxes, including income taxes, he is authorized to send a notice of such deficiency to the taxpayer. Taxpayer is defined in section 7701(a)(14) to mean "any person subject to any internal revenue tax." Section 6212(b)(1) generally provides that the notice of deficiency must be mailed to the taxpayer at his last known address. Section 6212(b)(2) provides: (2) Joint income tax return.--In the case of a joint income tax return filed by husband and wife, such notice of deficiency may be a single joint notice, except that if the Secretary has been notified by either spouse that separate residences have *266 been established, then, in lieu of the single joint notice, a duplicate original of the joint notice shall be sent by certified mail or registered mail to each spouse at his last known address. Section 301.6212-1(b)(2), Proced. & Admin. Regs., provides: (2) Joint income tax returns. If a joint income tax return has been filed by husband and wife, the district director (or assistant regional commissioner, appellate) may, unless the district director for the district in which such joint return was filed has been notified by either spouse that a separate residence has been established, send either a joint or separate notice of deficiency to the taxpayers at their last known address. * * * In view of the reasons for enacting the predecessor of section 6212(b)(2), it is clear that section 6212(b)(2) merely provides the Commissioner with alternate methods of providing notice to spouses.For example, the Commissioner may elect to send each spouse a separate notice of deficiency, regardless of their addresses, or he may send a single joint notice to them provided he has not been notified that the spouses have established separate residences. Garfinkel v. Commissioner,67 T.C. 1028 (1977); *267 Dolan v. Commissioner,44 T.C. 420 (1965). If the spouses have provided the Commissioner with proper notice of their separate residences and the Commissioner wishes to send joint notices, he must send a duplicate original of the joint notice to establish joint liability, but a joint notice issued to only one spouse at his separate address is sufficient to proceed against that spouse separately. Garfinkel v. Commissioner,supra;Dolan v. Commissioner,supra.Though one of the characteristics of joint and several liability is that the Commissioner may proceed against the spouses jointly, or he may proceed against one or both of them separately and obtain separate judgments against each ( Garfinkel v. Commissioner,supra;Dolan v. Commissioner,supra), it is clear that section 6212(b)(2) does not dispense with the necessity of sending notice of the deficiency to the taxpayer (either the husband or the wife) against whom the Commissioner wishes to proceed. Despite the joint liability of Louise, we have no jurisdiction to hold her liable for a deficiency if a proper notice thereof has not been sent to her. Secs. 6212 and 6214(a); cf. Kisting v. Commissioner,298 F. 2d 264, 268 (8th Cir. 1962), *268 affg. a Memorandum Opinion of this Court; Garfnkel v. Commissioner,supra at 1031-1032; Dolan v. Commissioner, supra at 432-434; Heaberlin v. Commissioner,34 T.C. 58 (1960). Issue 12. Fraud
OPINION The final issue for decision is whether any part of the underpayments of tax for each of the years in issue was due to Sam's fraud with intent to evade taxes within the meaning of section 6653(b). [6]The Commissioner bears the burden of establishing fraud, and he must prove it by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Levinson v. United States,496 F. 2d 651 (3d Cir. 1974), cert. denied 419 U.S. 1040 (1974); Estate of Pittard v. Commissioner,69 T.C. 391 (1977); Estate of Temple v. Commissioner,67 T.C. 143 (1976); Imburgia v. Commissioner,22 T.C. 1002 (1954); Petit v. Commissioner,10 T.C. 1253 (1948).To establish fraud, the Commissioner must show that the taxpayer intended to evade taxes which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F. 2d 366, 377 (5th Cir. 1968), *269 affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F. 2d 56, 60 (9th Cir. 1958); Acker v. Commissioner,26 T.C. 107, 112-113 (1956). The presence or absence of fraud is a factual question to be determined by an examination of the entire record. Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). To establish fraud, the Commissioner relies on the following factors: (1) gambling income omitted from the Sage Patch daily report sheets in the form of checks for each year. (2) the omission of bar profits from the Sage Patch daily report sheets for each year, and (3) Sam Presley, Sr.'s full ownership of the *270 Sage Patch and his responsibility to report all Sage Patch income on his income tax returns, which he failed to do. Specifically and additionally for 1965, respondent relies for fraud on his affirmative proof that petitioners failed to report as income the amount of $4,500.00 which Sam Presley, Sr., won from Fredrick Levin. Based on all of the evidence, we have concluded earlier in this opinion that Sam and Louise did not underreport their income from the bar, and that, except for the two checks negotiated by Louise, their "collections" entries on the daily reports of the casino properly reflected the net amount of checks cashed. Though Sam was the owner of the Sage Patch, we have also held that he followed adequate accounting and recordkeeping procedures in the operation of his bar and casino. The only remaining factors relied on by the Commissioner are the $4,500 Sam won from Mr. Levin and the two checks negotiated by Louise. In each instance, we sustained the Commissioner's determinations because the petitioners failed to carry their burden of proof; the Commissioner presented no evidence to show that the omission of such payments was deliberate. See Holland v. United States,348 U.S. 121, 139 (1954); *271 Spies v. United States,317 U.S. 492, 499-500 (1943). Moreover, such payments are clearly insufficient to establish a pattern of omissions of substantial amount of income. Holland v. United States,supra;Adler v. Commissioner,422 F. 2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Estate of Upshaw v. Commissioner,416 F. 2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court, cert. denied 397 U.S. 962 (1970); Agnellino v. Commissioner,302 F. 2d 797, 801 (3d Cir. 1962), affg. on this issue a Memorandum Opinion of this Court. Nor is there any other evidence of fraud by the petitioners in this case. Accordingly, we hold that the Commissioner has failed to carry his burden of proving that any part of any of the underpayments of taxes was due to fraud. Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.↩
a. There are slight unexplained mathematical errors in the totals.
a. Other expenses included payroll, utilities, dice, bonus, charity, bookkeeping, withholding and social security taxes, auto bar, other bonuses, accountant, and depreciation.↩
a. Other expenses included payroll, utilities, dice, bonus, charity, bookkeeping, withholding and social security taxes, auto bar, other bonuses, accountant, and depreciation.
2. Unless otherwise indicated, all references to a Rule are to the Tax Court Rules of Practice and Procedure.↩
3. The only issue the Commissioner raises with respect to Sam's method of reporting the checks is that he under-reported the net amount of checks on several occasions. The Commissioner does not argue that San should have included the full face value of the checks in income and then subsequently made adjustments to their income as the checks became worthless. In addition, the Commissioner does not question what happened to the dishonored checks after they were returned to the casino. Accordingly, we will not consider such issues, and we will confine our opinion to the issues as presented by the parties.
4. Moreover, in his notice of deficiency for 1963, the Commissioner did not question the amount of the losses or whether they had been substantiated. To the extent the Commissioner raises such issue at the trial and on brief, it is new matter under Rule 142(a)↩, with respect to which he has the burden of proof.
5. The petitioners have not argued that they are entitled to a deduction for expenses in excess of the bar income, and accordingly, we hold that they are not entitled to any deduction for such excess expenses.↩
a. There is a slight unexplained mathematical error in the figures.↩
6. Sec. 6653(b) provides in relevant part: (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013↩, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.